Keisha Sutherland v. Commissioner of Social Security Good morning, Your Honor. May it please the Court. My name is Jane Tomich and I represent the appellant, Ms. Keisha Sutherland. Before I begin, I'd like to request to reserve two minutes for rebuttal. Okay. Thank you. Your Honors, this 12-year case deserves relief from this Court because despite multiple occasions to do so, the Social Security Administration failed to apply this Court's binding precedent with respect to Ms. Sutherland's case. Moreover, after clear remand instructions, the Social Security Administration, again, failed to correct these shortcomings. At minimum, this... Here you have a case where I understand the non-treating positions, and we see a lot of these, where the non-treating position comes in and gives an opinion that's contrary to the person's actual course of treatment position, the person who supervised the claimant the most and is most familiar with the claimant. But here you have a treating physician who also says that she is not disabled. Why wouldn't that, combined with what the ALJ weaves together to rationalize rejection of benefits, why wouldn't that make it different than some of the cases that you're relying upon where the ALJ just rejects the treating physician's course of treatment? Yes. So the ALJ relies partly on Dr. DeAnna's 2012 opinion, which I think is the one you're referring to, but does not give it full credit as well. But also, this court specifically asked to look at the time period from 2007 through 2009, which was the time period that the 2012 district court was looking at. And when there is any 12-month period where a claimant is unable to perform substantial gainful activity, that warrants a finding of disability. And once that... There's conflicting evidence about that. There's Mosley's, and then there's Kerr's. Correct. There is Dr. Kurtz's opinion, and the 2012 district court looked at Dr. Kurtz's opinion and decided that that was not contradictory evidence to Dr. Mosley's opinion and that that was not a viable reason to discount Dr. Mosley's opinion. That was made more than a year later based on continued treatment of Ms. Sutherland. And so Dr. Kurtz's 2007 opinion was a one-time consultative examination, and this court has found that the opinion of a treating physician is entitled to great weight. And while it's true that when there is contradictory medical evidence, the ALJ has leeway to weigh the evidence and make determinations about credibility, the ALJ has to provide reasoning for why they're discounting an opinion. There was a 30 out of 30 mental status exam. There was... And I have a feeling that there was a little concern that a lawyer had come in and that Mosley's report, which there was no treating notes the whole year, said treated this person for a whole year, absolutely no notes of treatment. And then, you know, communication with the attorney, and a report is written up that might have been made to order, but difficult to say exactly what's going on during this whole year. And then there was an opportunity on remand for the lawyer to say, well, we need some more, and the ALJ said, yes, it might be very helpful. But the attorney didn't seem to want to pursue that path. So it's kind of, you know, what's the ALJ to do in that situation? So there's a couple points I want to address in your question. So first, during this time period, there are the prescription notes from Dr. Mosley, along with Ms. Sutherland's testimony, that paint a picture of a doctor attempting to stabilize a patient and find a medication that works. During this period, in the prescription notes, you see the prescriptions constantly changing. And prescription notes, but not treatment notes. And then we also have a treatment note from November in 2008, which references earlier treatment notes with documented symptoms of paranoia and delusions prior to the November 2008 hospitalization. Are you referring to Sondra's notes or Mosley's notes? Dr. Mosley's note from November 2008. It's in the Joint Appendix at 335. And I also wanted to address the issue of the 30 out of 30 on the mini mental health assessment. The type of reasoning that the ALJ is engaging in her analysis of discounting Dr. Mosley's opinion by going back to Dr. Mosley's initial evaluation of Ms. Sutherland and picking out an examination that was done in the treatment center and using that to contradict her later conclusions after treating Ms. Sutherland for two years about her ability to function in a work setting is exactly the kind of reasoning that this court has admonished in Morales and in Brown & Well, where this court has explicitly said that a treating physician's notes about how a patient is doing, whether they're stable or during treatment, cannot be a reason or is not necessarily a reason to then discount that doctor's opinion that that patient is unable to perform in a work setting. Moreover, the treating physicians, Dr. Dupree and Ms. Roberts, who treated Ms. Sutherland from 2012 to 2014, have extensive treatment notes and their opinion supports and is consistent with Dr. Mosley's. Yet the 2014 ALJ did not address this consistent evidence in the record. Are you saying we should take evidence from 2012 and use it to intuit what was happening in 2007 and 2008? So I don't think that we should use it to guess at what was happening in 2007 and 2008, but I do think that it is consistent with Dr. Mosley's overall assessment of Ms. Sutherland's level of disability. And I think that the case law has shown that an ALJ has to consider evidence that is consistent when they're choosing to discount a treating physician's opinion. The ALJ's opinion here, discounting Dr. Mosley, is picking pieces of the record that, in her view, contradict Dr. Mosley's opinion, but is not engaging in analysis of the record as a whole and looking at the opinions of treating physicians that support Dr. Mosley's opinion. Should we remand to find the treatment notes? Are there treatment notes? So in our view, it's unlikely that those treatment notes would be able to resurface at this point. This has been a 12-year case. On remand in 2012, the district court specifically asked that if the ALJ was confused about the treatment or lack of treatment notes, that she should request those and have the power to do so or issue another consultative exam. At the hearing, in the transcript notes, the administrative law judge voices extreme confusion over what the remand order is asking her to do, wondering if it's a physical or a mental consultative exam that is being asked to give, and does not engage in a clear discussion with Ms. Sutherland or her attorney about what medical records they'd like submitted. But the lawyer seems to say, I'll leave that up to your discretion because you're the one that has to make that decision. Yes, and that comment was specifically about the consultative examination. The administrative law judge does not, at the hearing, address the records, Dr. Mosley's treatment notes that are not in the record. And moreover, the ALJ is saying it's the ALJ's discretion to have that consultative examined. Right after that, in the record, she says that she finds consultative exams very helpful, yet she did not issue one. The consultative exams in the record, Dr. Fugatz and Dr. Ferreira's, who were non-examining physicians. Fugatz did not see her? Sorry? Fugatz did not see her? Fugatz did not see her. And then Dr. Kurtz, who did, was the one-time consultative exam. Where's the GAF score that Fugatz gave, the 60? Where's that coming from? Is that just the assessment of the records that he has or she has? Yes, it's from Dr. Kurtz's assessment. And so Dr. Kurtz's assessment was in 2007, and then Dr. Ferreira and Dr. Fugatz as well, were both opinions based on the record before Dr. Mosley's mental impairment questionnaire in December 2008. So they were evaluating, in that closed period, they were evaluating just the initial hospitalization, and then Dr. Kurtz's opinion after seeing her one day. And that's in contrast to Dr. Mosley, who saw Ms. Sutherland every month, sometimes twice a month, according to Ms. Sutherland's testimony. It went from Mosley to Yanitz? Yanitz, yes. What was the highest GAF score that the Yanitz assigned? 60, I believe, is the highest. And that was in 2010? I believe. It might be 65. I can check on that. But I believe 65. The questionnaire is addressed to Gary Smith. Is that the lawyer? Yes. Do you know the highest GAF score, her most recent GAF score within the hospital? Yes. So the highest GAF score that her most recent physicians have given her is a 51, and the highest in the last year, they said, was a 48. Dr. Dupree and Ms. Roberts, the ALJ, also discounts their opinions for similar types of reasoning. She picks and chooses through their treatment notes points where they say that Ms. Sutherland is stable or controlled on medication, ignoring the fact that at multiple times they say that stressors impact Ms. Sutherland's ability to remain compliant with medications, ignoring the fact that at one point she collapsed during treatment and was hospitalized, ignoring the fact that the medication itself gives side effects of being extremely drowsy and dizzy, and those are documented by her physician and in Ms. Sutherland's testimony. The ALJ seems concerned at the hearing of Ms. Sutherland's personal life, her relationship with her husband, infidelity with her husband. And when Ms. Sutherland at the hearing is describing her, this is the 2012 hearing, is describing her symptoms, her dizziness, her fears, the fact that she gets confused and is scared in 2012, the fact that after being hospitalized she chose to move in with her grandfather because she was scared of leaving her daughters alone in the house again, as she had when the police found her. The ALJ's response to those questions is, well, you know, from where I'm sitting, you could go down and interface with Jamaicans, so I don't see the problem. And that is in the hearing. I can find the exact page, but it's in the hearing testimony. It is. I'll give you the page in rebuttal. But and the hearing in itself, I think, indicates the ALJ's form of reasoning, which is echoed in her opinion, which is she speculates and uses her lay opinion to determine that Ms. Sutherland is stable on medication, ignoring the opinions of Dr. Mosley and Dr. Dupree and Ms. Roberts. And formulating that opinion. And that is the reasoning that has been admonished in this court, not just in... The high JAS, I assume they were all obtained while she was compliant with medication. The 61, the 65, the 51, which for her is in high school. Yeah. That was all while she was compliant? I believe so, yes. And the... My time is up. Well, you can finish your statement. You can exhale. And as I was going to say, the low JAS scores that are consistent with Dr. Mosley's opinion, the ALJ speculates that those might be a clerical mistake or that perhaps because they differ practitioner to practitioner, they should not be credited. And that was not an appropriate way to handle those, in our opinion. Thank you. Thank you. Thank you. Good morning, members of the panel. May it please the court, my name is Greg Marzano, and I appear today on behalf of Apelli Andrew Saul, the commissioner for the Social Security Administration. As impaired as Ms. Sutherland was when she stopped using her medication on two different occasions, 16 months apart, the ALJ correctly focused on the statutory requirement that an individual be unable to work for at least 12 continuous months to qualify for disability. No matter how severely limited a person is for days, weeks, even months at a time, she is not disabled if her condition improved to the point where she could work within a year. The ALJ reasonably found that Ms. Sutherland... The condition only improves to that extent when she's on medication, and one of the most remarkable facts about her illness is the fact that she's not compliant with the medication. Does that impact at all on the end of the ALJ's analysis? No, Your Honor. Medication to treat ailments is a part of the system. People who suffer from a variety of ailments are able to go to work to contribute regardless of how bad they would be if they were off medication. If their symptoms are sufficiently controlled with medication so that they can function. I'm sorry, Your Honor. If their symptoms are sufficiently controlled as an illness, the pathology is sufficiently controlled through medication so that they can, in fact, perform whatever job they're working at.  We look at... We've been asked to take a look at a two-year period, but if we look at the entire seven-year period, she is compliant with medications, and she is able to take care of a number of important aspects in her life. She raises two girls, takes them to cheerleading practice. Well, she raises two girls, but she thinks that they're the evil and... I mean, the psychotic relationship, and this is a psychotic relationship, is marked. So, I mean, the two girls, they came upon the earth, and they grew, and she was in a mother-daughter relationship with them during that time. And to say that she raised them seems to me to be taking quite a bit of liberty with the nature of the relationship and the nature of her psychosis. Respectfully, Your Honor, I don't agree with that, because I think that what the record shows is that she had postpartum in 2001, and that's where the belief that I think you were alluding to occurred. She gets that under control. She works from 2001 until 2007. While she's taking her medication, she is caring for her children. I think another important thing to think about is when... In 2008, she has a GAF at one place of 15, which is hard for me to imagine, and another at 35. That is a severely impaired individual, and that's on November of 2008. Well, you're right, Your Honor. It is a severely impaired individual, and that's why she needed to stay on her medication. That's why she was hospitalized. And so if that's in July 2007, what 12-month period do we have to tie together? We really don't have anything there, Your Honor. We have July 2007, and then a point that we raised in our brief is that she goes to see her neurologist, Dr. Caranuccio. Dr. Caranuccio examines her twice within three and then four months of her hospitalization. His mental status examination findings are completely normal. Not only that, Your Honor, but we have the examination from Dr. Kurz, and Dr. Kurz, as the panel discussed with counsel, found that she had no significant limitations. I think the language that he used is really important. If we look at Joint Appendix page 277, at no time during the interview or evaluation did it appear that any mood, thought, personality, or attention disorder affected her performance. What about rejecting Mosley? That seems to be the main bone of contention here. You're right, Your Honor. I do think that is the main bone of contention, and I think that what we have here is an ALJ's decision that, first of all, isn't that dissimilar from the assessment that Dr. Mosley made. If we look at the residual functional capacity that the ALJ found, she describes limiting plaintiff to simple, unskilled work, work that is essentially isolated with only occasional supervision. Remember, there are only three areas that Dr. Mosley determined Ms. Sutherland was completely unable to perform, and in those areas the ALJ we find in the RFC assessment accounts for that, accounts for that by isolating her, by putting her in a low-stress work environment. One of the issues that Dr. Mosley had was can she deal with workplace changes? Dr. Mosley said no. The ALJ said, well, we're going to limit her to only occasional changes. But it's more than that, Your Honor, because what we have is a decision by the ALJ that gave very specific reasons for not giving full weight to Dr. Mosley's opinion, and that's the ALJ's job. There are competing opinions throughout this case. There is conflicting evidence throughout this case, and the ALJ has to take that evidence and has to determine what's right. Counsel pointed out that the ALJ did not accept all of Dr. DeAnne's opinion. Well, that's right. She was more restrictive than Dr. DeAnne's. She did not go beyond what Dr. DeAnne said. She said, no, I've looked at the whole record. I think she's more limited than Dr. DeAnne's, but I still think that she's able to work. So based on that, Your Honor, I think what we have here actually is quite a good decision by the ALJ, counting off a variety of reasons for which Dr. Mosley's opinion was not entitled to full weight. Again, remember, she gave, ALJ Showalter gave varying degrees of weight to various of Dr. Mosley's findings, and to suggest that it's inappropriate for the ALJ to look for supporting evidence in Dr. Mosley's own treating records, that that's somehow unfair, that's not consistent with the law. It's not consistent with the regulations. And I think Judge Rendell pointed out that there was concern. We only have two treatment notes from Dr. Mosley, one of which spends a good deal of time talking about we've got to get on the phone, her hearing's coming up, I've got to complete my opinion. So what then, by looking at the findings that Dr. Mosley had in her own records, we see that she's doing very well when she's compliant with medication. And let's remember, seven years, she is compliant for all but those two occasions when she's hospitalized. And again, those two hospitalizations take place 16 months apart. Is it appropriate to look at evidence outside the closed period? To determine the initial period, Your Honor? I think that we have enough in the initial period. Again, I mean, we have a substantial evidence standard here. And as Justice Kagan recently made clear, that standard is not high. So we could go back and forth with facts all day. But at the end of the day, if there's enough to support the ALJ's position, if there's a reasonable basis for it, then the commissioner's decision should be affirmed. And here we have more than a scintilla, more than a mere scintilla. We have three treating physicians, I'm sorry, three physicians, Ph.D. level psychiatrists, psychologists who opined that she could work in that initial period. You're, I'm assuming you would distinguish Morales and Brown and Well, because here your view is that the ALJ did give reasons. Yes, Your Honor. I think it's, you know, very important when we look at Morales and we look at Brown and Well, let's talk about the competition of evidence in those cases. It really wasn't much of a competition. We had two reviewing agency physicians, but then we had multiple treating physician, treating physician opinions, and I think even the CE, at least, I'm sorry, the consultative examiner in Morales also believed that Morales was disabled. And beyond that, in Morales, we have, the court had a great concern with the ALJ seemingly taking portions of, I believe Mr. Morales had oppositional defiant disorder, and so he did not cooperate with various investigations. The ALJ did not like that and essentially held it against him. And this court said that's inappropriate. But, again, we don't have that here. This isn't a case where there's been a misrepresentation of facts. This isn't a case where there's been missed evidence. This isn't a case where we have a number of treating physicians saying one thing and just reviewing agency physicians on the other side. Here we have a number of physicians, treating and otherwise, who have examined her and said that she's capable of working, and that certainly meets the substantial evidence standard. Thank you very much, Mr. Roof. Your intonation sounded as though you were putting an end to your statement. You've still got some more time. I'm not suggesting you have to take it. I'm sorry, I was just trying to answer Judge Rendell's question. Okay. There are a couple of other things that I'd like to address that came up. Number one, the suggestion that the ALJ was somehow minimizing Ms. Sutherland's interactions with people in Jamaica. Let's keep in mind the whole story here. Ms. Sutherland was born in Jamaica. She's been married to two Jamaican individuals. And what the ALJ was really getting at is that Ms. Sutherland is saying that she's unable to work. She's unable to do much of anything. And yet she's able to travel independently to Jamaica for a two-week period. That's not criticizing her for whom she's keeping company with. That's her family. She's commenting that she's able to travel independently down to Jamaica, which I would have difficulty doing. You would have difficulty getting on a plane and flying to Jamaica? Probably, Your Honor. I'm not much of a world traveler. Well, you don't have to be. You buy the ticket, you get on the plane. You have to go through TSA, which is not so easy. You get on the plane, you get off here in Jamaica. It's not a big deal. You can't do that. How did you get through law school? I have stepped on a rake. Remember the Bugs Bunny cartoons where it smacks you right in the nose? Anyway, I'd also like to point out that when we look at the initial period, again, we've got a 16-month period. It's divided up by various physicians who have examined the record or have examined her and who say that she is not disabled. One of them is Dr. Fagott, November 2007. He says the claimant is able to meet the basic demands of simple work. That's at Joint Appendix 296. Fagott did not see it, did he? No, that's correct, Your Honor. But as this court made clear in the Chandler decision, state reviewing agency physicians, their opinions, they have expertise in the field and they have a longitudinal view of the records and are entitled to wait. And the ALJ gave appropriate wait here. That opinion was then confirmed in April 2008. So now we're about four months away. I'm sorry, about six months away from the next hospitalization. Between April 2008 and the next hospitalization, we don't have any records. What we do have is Ms. Sutherland caring for a homebound grandfather. Now, her grandfather had one leg, was not able to leave the home, and let's remember that Ms. Sutherland's career was as a home health care provider. And she testified that she would get up in the morning, she would empty his urinal, she would prepare his meals so that he could take his medications, and then she would generally take care of him throughout the day, while also getting her kids ready and off to school. So that's the evidence we have leading up to the second hospitalization. And the date, I'm sorry, for the second hospitalization? The second is November 8th through November 18th in 2008. Okay. I'd also like to ask the court to consider that Ms. Sutherland is 31 years of age at the initial period in which she seeks disability. Under the regulations, this is an individual who is more likely to be able to adjust to different forms of work. So even though the ALJ determined that she could not return to her job as a nurse, with this very forgiving residual functional capacity assessment, there were a number, I believe the vocational expert found, three-quarters of a million jobs that Ms. Sutherland could do. There was also some discussion about the compliance, I'm sorry, about the period in which we have a gap in Ms. Mosley's, I'm sorry, Dr. Mosley's treating. And what we have there are prescriptions that change, but not because there was an issue with how Ms. Sutherland was doing on that. Because Ms. Sutherland testified at Joint Appendix 81, she testified that Dr. Mosley was changing her medicines because of the results of blood tests and liver function. Now, she was on Seroquel, and one of the issues with Seroquel is that it can have an impact on liver function. So the fact that Dr. Mosley is changing, is looking to find a different medication for her, doesn't indicate that she's having problems with compliance. It means that Dr. Mosley is trying to protect her from any side effects of Seroquel. So again, in that gap, we really don't have anything to indicate that Ms. Sutherland is having any issues with compliance. If we didn't have Kurt Kurz's report, would that make any difference? I think it would, Your Honor. I think that some of the issues regarding whether there should have been a second consultative examination, that that would have more weight, because a CE, I'm sorry, a consultative examiner is going to take a look at the person on a given day. If we don't have a person who's, any person who's talked to Ms. Sutherland in that time period, then I think this is a much closer case. Although Kurz just saw her once. That's correct, Your Honor. What do we make of that? Well, again, we've got to have 12 continuous months of an inability to work. And Dr. Kurz, I mean, his statement couldn't have been more clear, that this was an individual who, though she had restrictions, was capable of working. So it is an important, a very important examination and assessment and opinion that he gives us in this case. Whether it would be determinative if it was not here, I, again, I get back to the standard announced in BSTC. Whatever Justice Kagan said, you know, whatever the more than a scintilla threshold means, it means and means only such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. I think we'd have that with the state agency positions, with Dr. Caranuccio's examinations. But I think when we had to that, the consultative examination of Dr. Kurz, that there really isn't much of a choice here except to affirm. Thank you. Thank you. There's a couple of things I'd like to address on rebuttal. So first, I wanted to address the contention that the 2014 ALJ's opinion was in line with Dr. Mosley's 2008 report. Did that do that? Did we able to dig up the site? Yes. It is on Joint Appendix 580. And the direct quotation I was referring to was, well, Miss Simmons, which is Miss Sutherland's previous name. I've got to say, from where I sit, you're able to go to the airport, get on the airplane. You go down there, interface with Jamaicans. To 580? 580. Yeah. In 2012, the district court explicitly found that if Miss Sutherland's testimony was to be credited, it would constitute substantial evidence of disability. And that opinion was based on the testimony of the vocational expert at the 2008 ALJ hearing, which found that if credited, Dr. Mosley's opinion would mean that the claimant was unable to work. That is the only vocational expert who looked at the limitations specifically that Dr. Mosley had listed. So the fact that it probably focuses on which limitations Dr. Mosley highlighted, the vocational expert at that time looked at that report and found someone with these disabilities would be unable to work. Which expert again? I'm sorry. The vocational expert at the first ALJ hearing, that the 2009 opinion was based on. The second thing is that the appellee is looking at the opinions of the treating physicians and at the consultative examiners and in a way that is implying they're entitled to the same weight. This court has made clear the treating physician standard. A treating physician's opinion is entitled to more weight. And even in Chandler, which the appellee cites as the support for non-examining consultative examiners getting great weight, which they are at times entitled to. The court explicitly says in this case, the ALJ didn't merely just rubber stamp the analysis and that the non-treating physician's opinions aren't evidence in themselves but are based on evidence. And in this case, when the 2014 ALJ says that she's giving significant weight to these opinions, the only evidence she bases that on is she says that they're consistent with evidence in the record as a whole, not acknowledging that they are inconsistent with Dr. Mosley's opinion and the opinions of treating physicians Dr. Dupree and Ms. Robert. You do have one treating physician here who says that she can't work. And for the closed period. And then if you look at the record as a whole, the most recent treating physicians, Dr. Dupree and Ms. Roberts, our findings are more limited than Dr. Mosley. But now your opponent talks about the 12-month period. We have from Mosley an August 07 evaluation, correct? Yes. Then we have from Mosley a December 08 pre-hearing questionnaire addressed to the lawyer, correct? Yes. What else do we have from Mosley? We have the prescription records from that entire time period. I don't know. I mean, I hear what your opponent says, why they were changed. We don't know anything about that, do we? Yes. It's my belief that the appellate mischaracterized the record. Later in the conversation, Ms. Sutherland says, I've been taking Seroquel for a while. Sometimes they change the Seroquel and give me something else. But the next thing they give me, it doesn't work. So they put me back on Seroquel. But we don't know why the prescriptions were changed. Which we can hypothesize, but that's really not evidence of any kind of condition during that time period, is it? Well, we do know that in November 2008, she was hospitalized. And we do know that in 2012 through 2014, we're seeing the side effects of the medication and that Ms. Sutherland is having trouble staying compliant. Every physician since 2008 has said that Ms. Sutherland has had issues staying medication compliant and issues with the medications. So while we don't know exactly what's going on, we see that the prescriptions are changing. Then we have the treatment note in 2008 from November, which refers back to an earlier treatment note, which says prior to the hospitalization, there were symptoms of paranoia and hallucinations. And then Ms. Sutherland was hospitalized for 10 days. Additionally, we have Dr. Mosley report on the 2008 exam that the highest GAF score in the last year was a 50. And so that is indicative of Ms. Sutherland's condition during that time period. And if there are no further questions, Ms. Buckley, submit. When she was hospitalized in November 2008, Dr. Mosley indicated it was because she had stopped taking her meds, right? Not because the meds weren't working. Yes. Well, one could argue if they were working, she wouldn't have stopped taking them. I don't know. The rest of the mental health issue is difficult because, as I mentioned before, compliance with medication may well be a symptom of the underlying mental pathology. Yes. And I think that's what we see in the records from Dr. Dupree and Ms. Roberts that speak about Ms. Sutherland's compliance and how stress is an impact and factor on Ms. Sutherland's ability to remain compliant, as well as seasonal changes and other factors. Thank you. I want to take just a moment to thank you and the University of Pennsylvania and the clinical programs you're associated with, therefore, for taking this case. What year are you in in Penn? I just graduated. Okay. I hope you're not a freshman. You did an extraordinarily good job with a very complicated – the law is not that complicated, but in these cases the underlying historical record and treatment course is always complicated. We wouldn't be here without you.